Mr. McAndrews, good morning your honors, may it please the court, I'm initially going to address the motion to dismiss and I hope to keep about a minute of my opening time to address the motion for sanctions, but primarily I'll focus on the motion to dismiss. I first want to point out that the standard of review on the motion to dismiss should be de novo because the district court committed substantial errors of law in arriving at its conclusion. It applied an improper legal standard and applied a legal standard improperly to the extent it even recognized the proper legal standard. Even if that's an error, wouldn't it be harmless because the evidence really shows CISCO owns this patent? No, your honor, I don't believe that's true, and my reference possibly is not true. It's not true that the evidence would show that CISCO owns the patent. Why not? Well, your honor, let me, if your question deals with the burden of proof or if it deals with the interpretive weight applied to I think you have problems with both of those, but you can pick either one. Okay, I'll start with the weight that the district court gave to the during performance understanding of the parties, your honor. Doesn't the burden of proof always rest with the plaintiff to show standing? No, your honor. What do you mean no? That's jurisdictional. The answer has to be yes. Your honor, okay, the answer is yes initially. However, that burden can be satisfied by coming forward with a recorded ... Oh, there's a difference between a burden of proof and a burden of production, right, and you don't want to mix those, do you? No, your honor, I do not. So the burden to prove is always on you, but you could at least initially produce enough evidence to shift it back to the other party to rebut that evidence. Yes. Did you even do that? Yes, your honor, we did. We provided a copy of the recorded assignment from the inventor. Yes, but they say before that ever happened, the patent didn't ever belong to ESN. ESN didn't have anything it could ... Girard. Girard didn't have anything he could assign to ESN because it had previously gone to Hyperia. But as this court recently held in Cerf on the identical facts where there was a recorded, the only recorded assignment in the patent office was an assignment from the inventor to, in that case, ultimately Global Locate, that was enough to shift the burden because there was a presumption of validity that that assignment was proper. It would shift, again, the burden of production. You'd be misinterpreting it if you suggested that you shifted the burden of proof away from the plaintiff to prove their standing, right? Your honor, maybe we're arguing a point that doesn't have a great deal of importance except with respect to one element that the district court found against ESN, and that was whether proprietary information was included in Mr. Girard's patent. If you'd like me to address that- Why don't you go right to the substance of this, which is why do you think Hyperia doesn't own the patent? I believe that Hyperia does not own the patent because there was an informed, specific understanding between the parties during the time of performance that Hyperia did not own the patent. And it's more than simply that there is a declaration from the inventor and the president, CEO and chairman of the board of Hyperia that they had an hour-long discussion at the time and arrived at this informed conclusion. In addition, there's a lapse of seven to eight years during which time Hyperia never treated the invention as their own. And that's the circumstance that arises in the Cerf case. Maybe I'm confused about the facts, which I might point out the appendices here are kind of problematic and hard to follow. Some of the pages are missing and some of them are mislabeled in terms of numbers, but leave that aside. So maybe I'm missing something. But the conversation that took place between Girard and the other gentlemen took place four years after the document was signed, right? It didn't take place when the document was signed, right? That's absolutely correct. This clarification of their understanding. You refer to in some of the record, you argue that that was a modification. Is it your view that that was a modification of what the employment agreement said or that that was a correct application? Your Honor, to the extent it's construed as arguing that there's a modification, that was not our intent. What we intended to argue that as a fallback position to the extent that the during performance understanding is not given proper effect, that under Massachusetts law, despite Section 261 that requires an agreement, an assignment of a patent to be in writing, that Massachusetts law would support that where the circumstances reflect that no fraud is being committed, then an oral agreement, in other words, an assignment back to the company from- So is that your view? That it was that that subsequent four year later discussion was represented, resulted in a modification of the original agreement, or is it your view that that reinforced what is currently your view of what the agreement said? It absolutely reinforced, as our initial position, it absolutely reinforced that the party's understanding and the reason- Well, let me tell you what my problem is, so maybe you can address it. Even if you're right about the standard of review having changed, the district court still made findings irrespective of what burdens he placed on what party. And he made very strong definitive findings with respect to related and whether it was related, which is a term in the agreement. And he also made findings discounting the relevance and the, you know, whatever, the veracity of relevance of this four year later discussion between the parties. To me, no matter what the ultimate burdens are, you're still up here and I think you still have to establish to us that there was something wrong with what the district court did in that regard. Am I right about that? Yes, that is correct. All right, so why don't you go ahead and try to do that. And what is wrong with the district court's opinion is it said it weighed the evidence, it looked at the objective evidence. First, it looked at the objective evidence of whether it believed, based on anecdotal evidence of what it could figure out was the business of the company, reviewing things like trademark applications, articles incorporation, prior patent filings by the company, which are, which by the way is exactly the sort of information that the district court in DDB relied on and this court reversed and remanded. Get to the point. How do you get around, for instance, Gerard's statement that what he worked on at IPERIA was key areas of network integration, which is right up the alley of what we're talking about with this invention. Well, he was defining a genus of many things. Yeah, and he's saying that's exactly what I was working on. Your Honor, and if the agreement- And therefore, as the district court says, this invention was related to the present business of IPERIA. Gerard had nothing that he could modify or send back four years later. He had already given it to IPERIA. Your Honor, if the employment agreement was intended to have that breadth, it would have said that, but instead- It did say that. It said related to- Related to the business and research and development of the company, which is inherently- Or planned business. Which is inherently vague, as this court has found, and the only way to determine that is to determine what is the business and research and development of the company at the time. Right, and what the district court- And the parties in the best position to determine that, I apologize, Your Honor. Go ahead. The parties in the best position to determine that issue are the parties that are there at the time, they understand what their business is, they understand what the channels of trade are, they understand what is not their business and is instead their competitor's business. But what you have to overcome, among other things, are the district court's findings, which are not based on just his conclusions or his discounting this four year later conversation. He's looking at the patent applications. He's looking at the patent applications that IPERIA or its predecessor filed. He's looking at the fact that the patent application which resulted in the patented dispute here, the 519, excerpted major portions of the company's patent applications, that a portion of the network and the figures that described are precisely what's included in the other patents that the company owns. That seems pretty unassailable to me in terms of some relationship. I mean it doesn't say significant relationship, it doesn't ferret out what relationship is, but how can, if related doesn't include that, what we just saw from looking at the patent applications, then related, in my view, doesn't mean anything. So tell me while I'm wrong. No, no. Related, and I believe that the reason why the understanding of the parties is so important is because they have an understanding of what their business is. They understood that their business dealt with application servers that provided voicemail and other enhanced services. Mr. Girard's invention is on an entirely other end of a network where there are thousands of companies in the United States that provide telecommunication services in general, but their businesses are not necessarily related simply because they provide them. Let me see if I can understand that. If I understand the original patent, which I guess is called the SIPTSI patent, that was a software patent, right? Yes, your honor. Software and hardware elements, I suppose. It's primarily software. Well I thought that the argument you were making, and maybe I'm mistaken about this, is that Hyperia was in the business of providing the software. They got together with hardware manufacturers and offered a package to get them, right? Is that correct? In rare instances, they actually got together, but oftentimes they simply sold the software. So yes. Okay. So it was either selling the software or combining with a hardware member. They weren't in the hardware business. They were not in the hardware business. The argument here is that this isn't related to their business because it's a hardware patent rather than a software patent, right? Well, your honor, it's hardware and software. The patent certainly describes some software elements. But those software elements were already patented by Hyperia, right? Or there was an application pending. That's correct, your honor. So no one could practice the 519 patent without permission from Hyperia to use the software which was incorporated within this patent. Is that my understanding of that correctly? That's correct. And there seems to be a misperception that the SIP TSI application had something to do with the edge switch that is part of the 519 patent, part of the 888 application that resulted in the 519. It simply does not. The SIP TSI application deals with extensions that are necessary for an endpoint or for an item in the middle of the network to communicate with an application server. Those software functionalities are not necessary in any way, shape, or form for the 519 patent to operate. They're simply not even incorporated by reference. Can I take it up? The only elements that are incorporated... How are they related? They're not related in the sense that the parties understood. In the sense that. But see, part of your problem is Gerard writes this language. If he had wanted to explain he meant related to draw a distinction between hardware and software, he could have said so, right? Well, your honor, Gerard did not write it. The corporate attorney wrote it. It's a misperception again that Mr. Gerard drafted his own employment agreement. I think the reality is, and actually it's a record, is that employment agreement was provided by corporate counsel. It's likely standard language. It was not negotiated by Mr. Gerard. In any event, the canon of self-negotiation is only a last resort when other canons fail. Can I just ask you to quickly look at 519 figure 3, which is on A65? I mean, this is the patent, the 519 patent, figure 3. Yes. On the top box, there's the application server. Isn't that really what was covered by Iberia's earlier patents? Well, Iberia's business, and to some extent, the earlier patents, yes, correct. So this figure, which is the 519 invention, incorporates at least one of three boxes which they describe. Well, your honor, I would disagree. As part of Iberia's business. I would disagree, your honor. This figure does not, well, it describes in part the invention. It describes in part other elements of a network, of the overall network, and it specifically says third-party media services, intended to indicate that this is not something the inventor was deeming as his own. There's nothing in the claims. But that's not the question, whether or not he was trying to incorporate that. The question is whether there was some relationship between what this was doing and what he was inventing. And the fact, why does it not demonstrate, given that this is a figure that shows this is an integral part of what he's claiming is an invention, sufficient to establish the relatedness? Your honor, again, you say there is some relation. And I would concede that there is some relation. However, related, because it is inherently vague, you must go to the understanding that the parties had that they reached during performance of the agreement, because they, only they, know what the business and research and development of their company is. They're in the best position to determine that. They know what they intended by their agreement. And they apply it. You'd still have to show beyond that that he didn't use proprietary information, wouldn't you? That's correct, your honor. And as the district court chronicled quite clearly, the 888 patent application of IPERIA's is almost verbatim copied into the 519. Your honor, I would wholeheartedly disagree with the statement that it is substantially incorporated. The only thing about the 888 SIP, I'm sorry, the only thing about the SIP TSI provisional application that is incorporated by reference are system element definitions. And those system element definitions refer to specific hardware pieces, such as a soft switch or a media gateway or an application server. Those are simply there for purposes of definitions. They are not incorporating the specific details. By the way, the district court did not identify any specific details beyond stating that the details of the media gateway, the soft switch, and the application server are not disclosed. However, we demonstrated in our opening brief that those details are discussed ad nauseum in the article that was published. It's unchallenged that that article was published. There is nothing in the district court's opinion that finds that any specific detail beyond those three things that are obviously part of the published SIP TSI article, there is no finding whatsoever that any other detail was provided. The information that Cisco now on appeal has identified as being different are specific examples of extensions of the protocol, the SIP TSI protocol, that are mentioned in the SIP TSI article that was published. And in fact, many of those extensions come from public sources. They are referenced right in the SIP TSI application and article as coming from public sources. Your time has expired. We'll restore your three minutes of rebuttal and give Mr. Verhoeven an extra three if he needs to use it. Okay? Good morning. May it please the court. ESN's appeal asked this court to re-weigh the district court's factual findings. Well, not necessarily. The problem is that the district court on page 824 said that the discussion and agreement between Girard and Hawthorne is entitled to limited interpretive weight. And why isn't that contrary to our decisions suggesting that where you have vague terms like relatedness or proprietary, that the understanding that the parties gave to it is not of limited weight, but of overwhelming weight? Well, this court's decision in DDB Technologies states, when it remanded, stated that the employer's view that the agreement did not apply would only be significant had the employer been aware of the nature of the project. The crucial question this court held was the extent of the employer's knowledge of the project. Well, that's absolutely true. But I don't read the district court as saying, I'm going to disregard the Conoctin-Girard discussion because Conoctin didn't understand what was going on. He didn't say that, right? That's correct. The district, the case law as I understand it, Your Honor, says in these sorts of circumstances it's appropriate to look at extrinsic evidence, even post-dating the execution of the employment agreement, as to the party's understanding. And that is exactly what the district court did here. The district court did not disregard the declarations. Well, you said it's of limited interpretive weight, and I mean, I guess there are a number of possibilities. And there are reasons for that. There are reasons for that. He could have said, I don't believe Conoctin. He could have said, Conoctin didn't know what was going on. Or he could have implied an improper standard and said, well, I don't care what the party said because I'm looking at this stuff myself. Well, the DVB case was briefed before the district court. He was aware of it. And I don't believe it's a, I would disagree that we should interpret the language from that opinion as the district court disregarding the case law. What we have here with the Conoctin declaration, Your Honor, is a declaration with no corroborating contemporaneous documentary evidence, in which a good family friend of Mr. Girard's father, who has been in business with him for years and years and years, purports to recall a very specific conversation that happened eight years prior. And you weigh that against the actual document, contemporaneous documentary evidence of the party's understanding. For example, the SIP TSI application, which was incorporated in and included as part of the application, which eventually became the 519 patent, which Girard assigned to Iperia, contemporaneous documentary evidence of Girard's understanding of the scope of the agreement that's actually in writing and was created during the time period. And you weigh that against this declaration. The standard review for this, Your Honor, is did the district court commit clear error? And if I could just... What was the nature of the briefing before the district court on this issue? Obviously, some of this stuff was brought up. You say the DDB case was discussed. What was the argument? The argument, as I understand it, that the plaintiff made before the district court and the appellant makes here... Well, no, not only the argument they made, but the argument that you made. What was your argument as to why the evidence of the contemporaneous understanding should be disregarded? Well, I argue with respect to Mr. Connaughton's declaration, which is what the appellant is primarily pointing to, is that Mr. Connaughton... No, what was it before the district court? What did you argue to the district court? That his knowledge was... Connaughton's knowledge of this invention was incomplete and inaccurate. This was mistaken. In particular, Connaughton admitted at his deposition, after the declaration was submitted, we took his deposition, Your Honor, he admitted he'd never seen the patent before the litigation. He'd never seen the applications before the litigation. Did you argue he wasn't credible? We did argue that as well, but the primary argument was that his understanding was incomplete and inaccurate. Another example, Your Honor, really quickly, is he believed that the invention was limited to hardware and limited to what's called customer premises equipment. Well, if you look at the, for example, claims 13 through 19 of the 519 patent, it claims a method for the entire system, including software and hardware components of the system. It includes software, it includes the centralized components as well as the customer premises components. His understanding, even if you credit his declaration, according to him, his own understanding of the scope of that invention was much, much more limited than what the invention actually claims. It would be appropriate to discount this declaration that was submitted with no corroborating evidence in light of the fact that there's no question that he had a misconception of the scope of He also never, he wasn't a technical person, didn't check with any technical people. He wasn't a patent lawyer, didn't know the difference between claims or the specification, didn't check with any lawyers. So even if you credit that this conversation happened, and we did attack his credibility before the district court as well, but even if you credit that, there are a number of reasons why under this court's precedence that it was appropriate and not clear of error for the district court to find the contemporary documentary evidence, many, many pieces of documentary evidence outweighed after the fact litigation inspired declaration. Well, I'll tell you what my concern is. I mean, apparently this happens fairly frequently, that there is an agreement like this about relatedness or proprietary information or whatever, and somebody leaves the company and there's a discussion at the time of the departure as to whether something the person invented is automatically assigned to the employer or not. So this comes up fairly frequently, right? It does, yes. So the problem I see is that years later, somebody comes in who sued the way Cisco was here for patent infringement and says, hey, there's a neat defense here to this. We can say that it was automatically assigned earlier, and these people who have the written assignment really don't own the patent. So what strikes me is that given the vagueness of terms like relatedness and proprietary, it is appropriate to rely on the party's contemporaneous understanding and to give a great deal of weight to that so that you don't have this sort of second-guessing years later about an assignment that occurred and development that's occurred pursuant to that assignment. So that's the concern that I have. Maybe this is a case that's outside that concern. I understand that concern, Your Honor, but the other side of the spectrum, which should also be a concern to this Court, I suggest, is you shouldn't be an inventor after the fact, shouldn't be able to rewrite history by submitting a litigation-inspired declaration that's contrary to all of the documentary evidence created during the time and say, this is dispositive. My declaration outweighs all of this other evidence because if we were to take that tack, Your Honor, then we'd never be able to get these agreements enforced. And the other point I want to make is, of course, this is standing. And standing, it's appropriate for the district court to be the finder of fact here. And the appropriate standard on those findings of fact is whether there's clear error. And here, this is not a case where you can show clear error. There are multiple reasons to support discounting the declaration of Mr. Conanton in weighing that evidence against the multiple pieces of evidence. It really can't be disputed. How do you read our cert opinion? The cert opinion, it seems to me that there was a slight change in the law on the cert opinion. It wasn't there when the district court issued its order, of course. But to the extent anyone argues that that constitutes error, it's clearly harmless error in this case. And although we didn't really brief the cert case extensively, there was a lot of briefing in the reply. And if I might just cite a couple of cases to the court, there's many, many cases where the circuit courts have found when a district court judge who is a trier of fact misapplied burdens that is harmless error in light of the factual findings. And so, for example, the ESI Meats versus Gulf Florida Terminal case, which is a Fifth Circuit case, the court so held there was a bench trial. And the court held that any error in allocating the burden of proof was harmless, where judgment was based on extensive statement of the judge's findings of facts, which demonstrated that even the placement of the risk of non-persuasion made no difference at trial. So your position is we separate out the findings of fact, the finding with respect to relatedness, proprietary information, and his treatment of the declarations. And then it's fairly straightforward that irrespective of what burdens you're applying, you come out the same way. Absolutely, Your Honor. Absolutely. Let me go back to the point about Judge Dyke was relating about relatedness. I mean, the judge kind of agreed that the term relatedness is inherently ambiguous. But it seems to me, I mean, this goes to Judge Dyke's point about concern about how this is going to play out in these circumstances, which happen routinely, that there's another part of the inquiry of relatedness that occurred here, which is that there's strong evidence. I mean, you would agree that there can be circumstances in which there's nothing to point to with respect to what happened. You really don't know. It's like, is this related to this? And so there are circumstances in which, indeed, the testimony of the parties is going to be very compelling. But your position, I assume, is that this case is different based on the particular facts of it. Absolutely, Your Honor. In this case, all you need to do is look at the documentary evidence. The patent itself and the summary of the invention devotes columns 13 and 14 to describing the application server as part of the summary of the invention. Well, the application server was IPERIA's core business. It wasn't just related to it. It was its core business. An application server software cannot run unless it's integrated with hardware components. The claims in the patent, claims 13 through 19 are method claims that didn't claim the entire system. It requires application server software to be running on it, which is IPERIA's core business. Evidence shows IPERIA partnered with switch makers like Cisco and engaged in interoperability testing. Gerard testified himself in connection with the Cisco interoperability testing, quote, we viewed that at IPERIA as an important sales pathway so that those who bought Cisco equipment when they wanted to purchase a messaging system would have a number of pre-integrated solutions. Pre-integrated solutions, that's their product, that they could have confidence would operate with their Cisco equipment. There's evidence in the record that IPERIA partnered with a company called Sonus, S-O-N-U-S, and they entered into a pre-integration agreement with Sonus in which they jointly marketed and sold bundled hardware with their software, switches with their application server. There's just no question. The evidence shows that Gerard's job at IPERIA was chief technology officer, and it was his job, Connaughton said so, his job to make sure this software interoperated with these hardware switches that they're now saying is unrelated to their business. The evidence just goes on and on, your honor. The SIP protocol research that was being done, that was Gerard's baby at IPERIA. He was researching bringing the SIP protocol, which was an emerging technology at the time, into this network environment. The 519 patent is all about using SIP in this network protocol. Claim 6 of the 519 claims a SIP user agent. Claim 9 claims SIP agents, SIP proxy servers, SIP communications. Gerard testified, what was your involvement in development? Gerard said, quote, essentially research of key areas that related to network integration, such as the use of SIP. The evidence goes on and on that this patent is right down the middle of IPERIA's failure. IPERIA actually advertised that its product, quote, is widely regarded as having the most robust SIP support of any enhanced services platform available today. That's where they were going. Can I interrupt you on another point before your time runs out? And that is that these briefs, including the appendix, have a lot of confidential markings. I mean, I think those excerpts you have from the deposition are all marked confidential and so forth. I mean, it's kind of hard to contemplate writing an opinion if that's what happens or whatever. I'm just wondering, it wasn't clear to me why certain things were marked confidential and certain things were. So usually when we ask parties about that, they say, yeah, I don't know. Well, I'm familiar with this court's views on that. And we have Cisco. My client, Cisco, has not marked anything confidential in the briefing. Unfortunately, those were designated by IPERIA, which is represented by Goodwin. What we could do, Your Honor, is to go back and check with IPERIA's counsel and urge them to de-designate some of that information and send a letter to the court in the next two or three days. That's fine. You can do that. Thank you. Quickly, in my remaining time, I'd like to address the, even if we're wrong, inform them that if we feel it's necessary for our opinion, we'll probably use it anyway. Okay. Okay. This is an absolute plague. I mean, I understand what it's like. You know, you go before the district court. Everybody marks everything confidential. The district court doesn't have the time to put it on paper. And it comes up here with a record. We've had standard arbitration clauses marked as confidential. Arguments that parties have made to the district court treated as confidential. It's awful. If we need it for the opinion, we'll probably use it. I'll tell them that, Your Honor. Please proceed. Okay. In addition, just really briefly, the proprietary information point. If proprietary information, setting aside the relatedness, if proprietary information is used under this employment agreement, then you're out of the exception. And there's an automatic assignment. Well, here, in light of the briefing, it's now clear that appellant is not contending that, is not contesting that the 519 patent used information from the SIP TSI provisional application. So that issue is undisputed, as far as I understand. Well, but you've got Gerard's March of 2000 article that he co-authored that contains a lot of this information. So it's hard to call that proprietary, isn't it? Well, actually, it's a couple of points, Your Honor. First, the use of the proprietary SIP TSI information occurred prior to that time. So that article, although it was just a couple of months, that article was not public at the time it was used to file for the application. It tends to show that it was not confidential information. Well, the article is 13 pages. The SIP TSI provisional is 33 pages. So we've got 20 extra pages of detailed technical information that weren't disclosed. It's a relatively common practice. This isn't in the record, but I'll just say it's a relatively common practice at conferences that you do a cleaned, non-confidential version of what you're working on, and you don't disclose your technical details. We would submit that's what happened here. If you look at the 20 pages that weren't disclosed in the overview, they were important. They contained important technical information. For example, the SIP TSI endpoint normalization model, which was incorporated into the 519 patent as a key element into the technology of the 519 patent. Yeah, but you've got a situation where they put this in the provisional application. It's ultimately going to be published down the line at least when the patent is granted, right? So it could be that somebody said, well, we put it in there. We know it's going to become confidential sooner or later, so we don't regard that as proprietary. That's a reasonable position. There's no evidence of that. The evidence is that Gerard himself, when he filed the SIP TSI application, ensured that every single page of that document said, to IPERIA, non-disclosure agreement required. That's the evidence. And that was a use of IPERIA proprietary information prior to it ever being public and under the plain terms of the employment agreement that takes you out of the exception to the assignment clause. Thank you, Mr. Grohl. Thank you very much. Mr. McAndrews, we have the three minutes the court gave back to you. Thank you, Your Honor. It's important to point out that the district court did not make any credibility findings and did not find that Mr. Connaughton was uninformed. But I guess the argument is this. The argument is that the credibility issue was argued before him. The limited knowledge was argued before him, and we ought to interpret his dismissal of contemporaneous understanding as based on the things that were argued before. But expressly, the district court made it based on the fact that it was four years after the 1997 agreement was drafted. Clearly, and so that's the sole reason, in the opinion that we can learn, that the judge discounted the during performance understanding. It is clear that the district court misunderstood this court's precedent. It believed that it was applying a canon of contract construction of extrinsic evidence available at the time that the agreement was drafted. It didn't recognize that what is missing during performance is you don't know what the business and research and development of the company is unless you look outside the bounds of the agreement. It's very clear, based on that statement, that the district court discounted the during performance understanding simply because it occurred four years later, not for any credibility reason, not for any reason of knowledge. Well, I guess I don't want to belabor it, but I read it completely the opposite on A23 at the bottom. On balance, though, this assessment by Mr. Girard and Conahan does not override the weight of the evidence to the contrary discussed above. Period. And then they say, further, this assessment occurred four years after blah, blah, blah, and is therefore of limited interpretive weight. So they make a statement with respect to the four years, but preceding that, without the four years, he talks about the weight of the evidence to the contrary, which doesn't include the four years. That's right, Your Honor. If you have the weight of the evidence to the contrary and the weight of the during performance understanding and you give this limited interpretive weight, then, of course, it's going to be outweighed. Your Honor, there's no other way to read that. If it was given proper weight, which is highly relevant, if not dispositive, as stated by this court, then it might be like – But he's considering everything, isn't he? He certainly considered it, but he absolutely gave improper weight. And it's not just this court that has said that the during performance is the most relevant evidence. It's the courts in Massachusetts and the Supreme Court. The Supreme Court said that the practical construction with the parties put upon the terms of their own contract and according to which the work was done must prevail over the literal meaning of the contract. This is where you have a literal meaning. So, for example, if the literal contract said, if Gerard's invention relates to voiceover IP, but during performance they went contrary to that literal statement, the during performance interpretation of the parties must prevail according to the Supreme Court. There is no reason why the during performance understanding of the parties should not prevail here. There are a couple things that – Thank you, Mr. McAndrews.  Thank you, Your Honor. All rise.